IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BEAU HOUSTON GRAY,

                Petitioner,

vs.

MARION SPEARMAN, Warden,
Correctional Training Facility,[1]

                Respondent.

No. 2:13-cv-00775-JKS

MEMORANDUM DECISION

Beau Houston Gray, a state prisoner represented by counsel, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Gray is in the custody of the California Department of Corrections and incarcerated at the Correctional Training Facility in Soledad, California. Respondent has answered, and Gray has replied. This Court recently denied the petition for habeas relief filed by Gray's co-defendant, Curtis Wayne Taylor, in *Taylor v. Muniz*, No. 2:13-cv-01826-JKS. Gray's Petition raises many of the same issues raised in Taylor's case.

## I.  BACKGROUND/PRIOR PROCEEDINGS

On November 30, 2009, Gray and his co-defendant Taylor were charged with murdering (count 1), torturing (count 2), and assaulting (count 3) Travis Smith. With regard to count 1, the information alleged a torture murder special circumstance. The information additionally alleged that Taylor and Gray had personally inflicted great bodily injury with respect to count 2 and that count 3 constituted a "serious felony" due to the fact that such injury had been inflicted. On

---

[1]      Marion Spearman, Warden, Correctional Training Facility, is substituted for Fred Foulk, Warden, High Desert State Prison. FED. R. CIV. P. 25(c).

direct appeal of his conviction, the Court of Appeal recounted the following facts underlying the

charges against Gray:

>On June 8, 2008, defendants spent the day drinking alcohol and smoking marijuana at the Shady Oaks Mobile Home Park with 14–year old T.D., 18–year old Tabitha Bigger, Shane Venzke, and others.
>
>At some point T.D. left with the victim Smith, who was "extremely drunk," and two others to get more alcohol.  According to T.D., Smith touched her "butt" as she was getting into the car and, once inside, touched her hand and told her she was pretty.  Word of Smith's alleged touching quickly spread throughout the trailer park.
>
>After returning from the store, Smith went to the home of Jimmy Jones, who also lived in the trailer park, and told Jones that "[t]hose people down at the trailer park think I touched that little girl."  Jones asked Smith whether he had touched her, and Smith said, "No."  Smith purchased some methamphetamine from a woman at Jones' home and snorted a line or so that night.
>
>Later that evening, Jones and Smith were approached by defendants as they walked along a canal near the trailer park. T.D., Venzke, and Bigger were also present.  Taylor punched Smith in the face, and Smith fell to the ground, striking his head.  While Smith was on the ground, Gray stomped on his head.  Jones asked Taylor why he attacked Smith, and Taylor said it was because Smith was a child molester.  Defendants left Smith unconscious and bleeding, returned to the trailer park, and continued partying.
>
>Less than an hour later, defendants returned to Smith, who remained on the ground where he had been beaten.  Taylor asked Smith whether he was going to touch little girls again, and Smith said, "Yeah."  Taylor then slapped him.  Taylor again asked Smith whether he was going to touch little girls, and Smith said, "Fuck yeah."  Taylor then punched or kicked Smith, while Gray stomped on his head "really hard" with the entire weight of his body.  Defendants emptied Smith's pockets, taking his wallet, marijuana, methamphetamine, and possibly a ring.  Defendants left Smith unconscious and went to Jones' home.  They had methamphetamine when they arrived.  Jones tasted the methamphetamine and identified it as the same methamphetamine his friend sold to Smith earlier that evening.
>
>Approximately 20 minutes later, defendants again returned to Smith.  As Smith attempted to move, Taylor began punching him in the face, while Gray stomped on his head and chest.  Smith pleaded with defendants to stop.  When defendants were finished, Smith was barely able to speak.  Taylor urinated on his head.
>
>Defendants told T.D. and Bigger not to call an ambulance or 911 and not to tell the police anything about defendants' involvement if questioned.  If they did, Taylor said "he would know who did it and something would be done."  Taylor asked Gray to take Smith home so he did not die where he lay, and Gray told Taylor that Smith "could lay there and die for all he cared."
>
>Early the next morning, T.D. walked by the scene of the beatings, and Smith remained there unconscious.  Defendants also were there.  Taylor was cleaning off the fence near where the beatings took place, while Gray stood around.  At approximately

6:30 a.m., a mountain biker saw Smith and asked a resident of the trailer park to call for help.

Ten to fifteen minutes later, a Redding police officer arrived and found Smith unconscious next to the fence.  Smith's eye was swollen and discolored, and he had blood running from his nose.  Smith told the officer he had fallen during the night and injured himself.  Smith smelled like alcohol and had trouble standing.  The officer called an ambulance, and Smith was taken to the hospital.

Smith was diagnosed with a traumatic brain injury and was placed in the hospital's intensive care unit.  He had multiple intracerebral contusions and an "altered level of consciousness."  He also appeared to be suffering from acute alcohol withdrawal.  He remained in the hospital for eight days.  When he was released on June 16, 2008, his discharge papers did not say that he should refrain from consuming alcohol; however, Dr. Ashok Jain, the consulting neurosurgeon on Smith's case, told Smith and Smith's sister that Smith should not consume alcohol or take any medication without Dr. Jain's knowledge.

After being released, Smith stayed with his sister.  He was unusually quiet, complained that his head hurt, and said he wanted to lie down.  His wife visited him at his sister's home on June 17, 2008, the day after he was released from the hospital.  Smith told her that he "wanted to go into a rehab because he was going to die if he continued to drink . . . ."  He also complained of pain in his head.  Smith was unusually quiet during her visit.

Later that evening, Smith drank beer with a friend, who observed that Smith "wasn't himself."  Smith "collapsed, fell down" on his way to the restroom.  He was not finishing his sentences and was jumping from topic to topic.  He also appeared pale.  His friend left around 9:00 or 10:00 p.m.  Smith's sister's boyfriend last saw Smith at 11:30 p.m.; he was the last person to see Smith alive.  Smith's sister discovered Smith's body the following morning, June 18, 2008, at approximately 7:00 a.m.  There were several empty 12–ounce beer cars and three empty 32–ounce beer cans near Smith's body.

Later that day Gray was interviewed by Officer Todd Cogle of the Redding Police Department.  When asked what he was doing on June 8, 2008, before Smith was assaulted, Gray said he was drinking in the trailer park with a couple of "chicks" when Smith walked through, and one of the "chicks" started "freaking out," saying that Smith had molested her.  Gray asked Smith if he was going to stop touching little girls.  Gray initially said that Smith pulled out a knife and attempted to cut him, and that he kicked Smith in the head.  Later, Gray acknowledged Smith did not pull a knife on him and confirmed that when Smith attempted to get up, Gray kicked him back down. Gray said that Smith was "hurting" but still talking when Gray left.  Gray returned to Smith two or three times during the course of the night, and Smith was beaten each time.  After Gray returned the second time, Smith was badly beaten; he had blood coming out of his nose and mouth, and his eyes were so swollen he could not see out of them.  Gray said Smith received 100 blows over the course of the evening but later gave different estimates.

Dr. Susan Comfort, a forensic pathologist with the Shasta County Sheriff's Coroner System, performed a postmortem examination of Smith's body hours after it was discovered.  She found several skull fractures.  "[T]he largest and most impressive

3

fracture was in . . . the back of the head.  It was slightly depressed, meaning the bone was actually pushed with enough force that it bent inwards, and radiating from a point of impact on that left area were three fractures, which then coursed into separate areas of the skull, one more towards the front, and the other two more towards the back of the head." She also found a separate fracture on the left side of the temporal region, which "ran down and intersected [with the] . . . fractures that were in the back of the head."  The fracture on the back of Smith's head was consistent with a very hard blow or falling backward and hitting the ground.  The fracture on the left side was consistent with a kick to the head.  Dr. Comfort also observed multiple contusions on the brain that corresponded to the fractures.

After performing the physical examination but before receiving the toxicologist's report, Dr. Comfort cautioned Officer Cogle that Smith may have died as a result of methamphetamine poisoning, alcohol poisoning, or a mixture of the two.  In addition to the head trauma, she found ischemic bowel changes, which can be caused by methamphetamine use.  She advised Officer Cogle that it would be "pretty risky" to charge anyone with Smith's murder before she made her official ruling on the cause of death.  She explained that "if we get the tox back and he's got methamphetamine and alcohol, then I'm going to be ruling it as an accidental drug, mixed drug and alcohol intoxication."  When asked what her opinion as to the cause of death would be "if the tox comes back clean or with just alcohol on board," Dr. Comfort responded, "Well then, we're only left with head injuries."

The toxicology report indicated that Smith's blood alcohol level was .14, which is equivalent to consuming seven beers.  He also had a very low level of Fentanyl,[FN4] which had not been prescribed, in his system.  Alcohol and Fentanyl reduce blood flow to the brain and could have been fatal to someone with Smith's injuries.  No methamphetamine was found.  Dr. Comfort opined that Smith's death was caused by blunt force injuries to the head, and that alcohol and Fentanyl intoxication were contributing factors.  She concluded that blunt force trauma was a substantial cause of Smith's death, and that he would not have died had he not been so severely beaten 10 days earlier.

FN4. Fentanyl is a narcotic analgesic that is used for pain and as a sedative.

Dr. Comfort estimated that Smith died around midnight on June 17, 2008.  She based her estimate on the investigator's observation of rigor in Smith's arms, legs, and jaw at approximately 7:00 a.m. the following morning.  Smith's state of rigor indicated he had been deceased for approximately eight hours.  Once a person is deceased, his or her body stops metabolizing alcohol.

Two CAT scans were taken of Smith's head upon his arrival at the hospital; neither revealed a skull fracture.  Dr. Noel Curcio, one of Smith's treating physicians, believed it was possible that the skull fractures observed by Dr. Comfort were missed but thought it was more likely that the fractures were received after Smith was discharged. He acknowledged that Smith's injuries were consistent with a skull fracture, and that a person with severe injuries like those discovered during the autopsy could succumb to those injuries days or weeks after they were inflicted.

4

Dr. Jain also believed that it was unlikely the radiologists who interpreted Smith's CAT scans missed any fractures.  Had Smith suffered the fractures prior to being released, Dr. Jain doubted that Smith's clinical condition would have been as good as it was.  Dr. Jain would not be surprised to find skull fractures in a person who had suffered the multiple traumatic injuries to the brain that Smith had.  He would "probably disagree" with Dr. Comfort's finding that the cause of death was blunt force trauma sustained 10 days before Smith's death because Smith's clinical condition was very good at the time he was discharged, and Dr. Jain had never seen that happen before.

The fact that the skull fractures were not observed on the CAT scans did not alter Dr. Comfort's opinion that the fractures were caused at the same time as the brain contusions.  She based her opinion on the fact that the skull fractures corresponded to the locations of the brain contusions, and the absence of any fresh trauma to the brain or injury to the scalp.  She explained that with "a very thin hairline fracture such as what you see here . . . and also when it's fresh . . . it's very easy not to see it on an imaging scan . . . ."  When she shared her findings with one of the radiologists that reviewed the CAT scans, he was not surprised that she found a fracture he did not and "said sometimes when the fractures are located down at the bottom of the skull or base of the skull is an area that is harder to scan, and sometimes it's easy to miss a fracture, especially if it's not displaced and just a simple hairline fracture."  Dr. Comfort further explained that if the fractures were caused by a fall after Smith was released from the hospital, she would expect to find corresponding fresh trauma to the brain or fresh injury to the scalp, which she did not.  Instead, she observed "some early signs of healing" that were consistent with the injuries being 10 days old.

Dr. Paul Herrmann, a forensic pathologist called by Taylor, opined that Smith "died as a result of a combination of injuries to his brain and also Fentanyl and alcohol intoxication."  Had Smith not used alcohol or Fentanyl, it is unlikely he would have died when he did.  Similarly, if Smith had not suffered the brain injuries as a result of defendants' attack, "the Fentanyl and alcohol would not have killed him."

Defendants did not dispute assaulting Smith.  Rather, during closing arguments Taylor's counsel conceded: "As far as the assault, at least as far as my client is concerned, he definitely assaulted Travis Smith.  There's no doubt about that.  And there's no doubt that in my mind that Travis Smith suffered something."  Gray's counsel likewise acknowledged that "there was an assault here, and certainly there was great bodily injury that was done here."  Defendants did, however, dispute that they had the requisite intent for murder and urged that Smith died as a result of his own actions following his release from the hospital, and not as a result of the assault.

*People v. Taylor*, No. C064852, 2012 WL 928244, *2-5 (Cal. Ct. App. Mar. 19, 2012).

Gray and Taylor proceeded to a joint jury trial on December 10, 2009.  On January 21, 2010, the jury found both defendants guilty of second-degree murder (count 1) and assault with force likely to cause great bodily injury (count 3) and also found true the allegation that they had

inflicted great bodily injury during the commission of the offense.  The jury found the

defendants not guilty of first-degree murder and torture and found the torture/murder special

circumstance allegation not true.

Gray then moved for a new trial, which Taylor joined.  The trial court denied the motion.

The trial court subsequently sentenced Gray to a determinate term of 4 years' imprisonment, plus

an indeterminate term of 15 years to life, calculated as follows: 4 years on count 3 along with 15

years to life on count 1.[2]

Through counsel, Gray appealed his conviction, arguing that 1) the trial court committed

reversible error by failing to instruct the jury on independent intervening causation; and 2) the

trial court should have stayed his sentence on the assault charge pursuant to California Penal

Code § 654.[3]  Gray also joined in "all beneficial issues and arguments raised" in Taylor's

briefing.  On March 19, 2012, the Court of Appeal issued a reasoned, unpublished opinion in

which they agreed that the trial court erred in refusing to stay Gray's sentence for assault with

force likely to cause great bodily injury and modified his judgment accordingly.  *Taylor*, 2012

WL 928244, at *1.  The Court of Appeal affirmed Gray's judgment in all other respects.  *Id.*

Counsel for Gray then timely petitioned for review in the California Supreme Court,

raising his instructional error claim and additionally joining in all "beneficial issues and

---

[2]      Taylor was sentenced to a determinate term of 12 years and 8 months'
imprisonment plus an indeterminate term of 30 years to life.

[3]      Section 654 provides in relevant part that "[a]n act or omission that is punishable
in different ways by different provisions of law shall be punished under the provision that
provides for the longest potential term of imprisonment, but in no case shall the act or omission
be punished under more than one provision."  CAL. PENAL CODE § 654.

arguments" raised in Taylor's petition for review.  The Supreme Court denied review without comment on June 13, 2012.

Gray timely filed a counseled Petition for a Writ of Habeas Corpus to this Court on April 19, 2013.

## II. GROUNDS/CLAIMS

In his counseled Petition before this Court, Gray raises a single claim that he was denied his right to due process and a jury trial by the trial court's failure to *sua sponte* instruct on superceding intervening causation.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory

power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where

holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it

cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"

*Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are

beyond the purview of this Court in a federal habeas proceeding.  *See Swarthout v. Cooke*, 131 S.

Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was

correctly applied).  It is a fundamental precept of dual federalism that the states possess primary

authority for defining and enforcing the criminal law.  *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62,

67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and

application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state

court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536

U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned

decision" by the state court.  *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004)

(citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  Under the AEDPA, the state court's

findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear

and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340

(2003).

IV. DISCUSSION

Gray argues that the trial court committed reversible error when it failed to *sua sponte* instruct the jury on superceding intervening causation.  In support of this claim, Gray avers:

> Petitioner had a fundamental constitutional right to jury trial on all elements of the offense, including the element of causation.  Since defense counsel conceded, based on substantial evidence, that the defendants beat Travis Smith on June 8, 2008, the only possible defense was lack of causation of Smith's dead on June 17 to 18, 2008.  The jury instructions read by the state trial court failed to explicitly instruct on the effect of superseding intervening cause, and failed to identify a blow to the head suffered after his hospital discharge as a superseding intervening cause.  Petitioner was denied Due Process and the right to jury trial, and relief must be granted.

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990).  The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment. *Francis v. Franklin*, 471 U.S. 307, 309 (1985).  This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72.  This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way

that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn. *Id.* at 72-73. "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation." *Id*. at 73 (citation omitted). Where the defect is the failure to give an instruction, the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law. *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). In those cases, the inquiry is whether the trial court's refusal to give the requested instruction "so infected the entire trial that the resulting conviction violates due process." *Id.* at 156-57; *Estelle*, 502 U.S. at 72.

Under California law, "[t]o constitute murder, there must be, in addition to the death of a human being, an unlawful act which was the proximate cause of that death. [¶] The proximate cause of a death is a cause which in natural and continuous sequence, produces the death and without which the death would not have occurred." *People v. Catlin*,  26 P.3d 357, 405 (Cal. 2001) (quoting CALJIC Nos. 8.55 and 8.58), *overruled on other grounds*. "In criminal prosecutions, the contributing negligence of the victim or a third party does not relieve the criminal actor of liability, unless the victim's or third party's conduct was the sole or superseding cause of the death." *People v. Autry*, 43 Cal. Rptr. 2d 135, 139 (Cal. Ct. App. 1995). "An independent intervening act is a superseding cause relieving the actor of liability for his negligence only if the intervening act is highly unusual or extraordinary and hence not reasonably foreseeable." *Lombardo v. Huysentruyt*, 110 Cal. Rptr. 2d 691, 699 (Cal. Ct. App. 2001); *see also People v. Schmies*, 51 Cal. Rptr. 2d 185, 194 (Cal. Ct. App. 1996) (stating that there may be a superseding cause of death only where the third party's conduct was "so unusual, abnormal, or extraordinary that it could have not been foreseen"); *People v. Armitage*, 239 Cal.

10

Rptr. 515, 525 (Cal. Ct. App. 1987) ("[I]t is only an unforeseeable intervening cause, an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause.").

"[A]s long as the jury finds that without the criminal act the death would not have occurred when it did, it need not determine which of the concurrent causes was the principal or primary cause of death." *Catlin*, 26 P.3d at 405. "Rather, it is required that the cause was a substantial factor contributing to the result." *Id.* This holds true even where the victim's preexisting physical condition was a substantial factor causing death. *Id.* "So long as a victim's predisposing physical condition, regardless of its cause, is not the *only* substantial factor bringing about his death, that condition . . . in no way destroys the [defendant's] criminal responsibility for the death."[4] *Id.* (citations omitted).

---

[4]     Gray's argument seems to be that Smith, after his release from the hospital, drank heavily in the trailer court and either accidentally or negligently fell, striking his head and suffering an additional skull fracture, which caused his death.  He recognizes that the evidence was conflicting regarding whether the skull fracture which the expert witnesses identified as contributing to Smith's death was received as a result of the beating Smith received from Taylor or Gray or occurred some time after Smith left the hospital, but argues that this conflict was for the jury to resolve under proper jury instructions.  In his Traverse, Grey seems to argue that the fall in the trailer park, and what he contends was the resulting additional skull fracture, was the sole cause of Smith's death and not a concurrent cause.  All of the evidence upon which Gray relies was before the jury and his theory that the skull fracture which caused his death was received after he left the hospital was argued to the jury without objection from the prosecutor or admonition from the court.  In finding that Taylor and Gray's beating Smith was a but for and substantial factor in causing Smith's death, the jury necessarily rejected the argument that a later fall was the sole cause of Smith's death.

The Restatement (Second) of Torts § 440 recognizes that a "superceding" cause may relieve an actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about; *i.e.*, a concurrent cause of the injury.  It is not clear that California would import into the criminal law a rule as broad as this.  Nor is it clear that California would even apply this rule as readily to intentional torts as it does to negligence.  Section 442, considerations in determining whether an intervening force ( defined in § 441) is a superceding cause, and particularly § 442(B), would apparently limit the superceding cause rule

The California Court of Appeal rejected Gray's claim that the trial court failed to *sua sponte* instruct the jury on superseding cause, stating, "While we agree with defendants that causation instructions were required under the facts of this case; we do not agree that the instructions given by the trial court here were lacking." *Taylor*, 2012 WL 928244, at *10. It reasoned:

> The trial court instructed the jury in the language of CALCRIM No. 240 (Causation) as follows: "An act causes injury or death if the injury or death is the direct, natural, and probable consequence of the act and the injury or death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence.
>
> "There may be more than one cause of injury or death. An act causes injury or death only if it is a substantial factor in causing the injury or death. A substantial factor is more than a trivial or remote factor. However, it does not have to be the only factor that causes the injury or death."[FN7] CALCRIM No. 240 "correctly indicates, in essence, that liability would not be cut off for an intervening act if the victim's death was nevertheless a 'direct, natural, and probable consequence' of defendant's original act." (*People v. Fiu* (2008) 165 Cal.App.4th 360, 372.) The language of CALCRIM No. 240 "requiring an injury or death to be a direct, natural and probable consequence of a defendant's act necessarily refers to consequences that are reasonably foreseeable." (*Ibid*.) Moreover, CALCRIM No. 240 defines a "natural and probable consequence" as "one that a reasonable person would know is likely to happen if nothing unusual intervenes." Further, while explaining that there may be more than one cause of death, CALCRIM No. 240 specifies that an act causes death "only if it is a substantial factor in causing . . . the death", and provides that a substantial factor "is more than a trivial or remote factor." By instructing the jury in the language of CALCRIM No. 240, the trial court implicitly instructed on the principle of independent intervening causation. (See *id.* at pp. 371–372.)

---

to intentional acts by third parties in cases like this where the alleged superceding cause involves an injury to the same area of the brain as the earlier beating resulting in the same harm as that risked by the actor's conduct. No intentional act by a third party was involved in Smith's fall in the trailer park.

The jury had before it Smith's history of alcohol and drug abuse. Assuming, without deciding, that a drunken fall could be a superceding cause if it was an unforeseeable, extraordinary and abnormal occurrence, the question then becomes is it possible that a jury could find a fall under these circumstances unforeseeable, extraordinary and abnormal.

FN7.  The jury was also instructed in the language of CALCRIM No. 620 (Causation: Special Issues) as follows: "There may be more than one cause of death.  An act causes death only if it is a substantial factor in causing the death.  A substantial factor is more than a trivial or remote factor.  However, it does not need to be the only factor that causes the death.

"The failure of Travis Smith or another person to use reasonable care may have contributed to the death, but if the defendant's act was a substantial factor causing the death, then the defendant is legally responsible for the death, even though Travis Smith or another person may have failed to use reasonable care.

"The failure of the doctors or medical staff to use reasonable care in treating Travis Smith may have contributed to the death.  But if the injury inflicted by the defendant was a substantial factor causing the death, then the defendant is legally responsible for the death even though the doctors or medical staff may have failed to use reasonable care.  On the other hand, if the injury inflicted by the defendant was not a substantial factor causing the death, but the death was caused by grossly improper treatment by the doctors or medical staff, then the defendant is not legally responsible for the death.

"Travis Smith may have suffered from an illness or physical condition that made him more likely to die from the injury than the average person.  The fact that Travis Smith may have been more physically vulnerable is not a defense to murder.  If the defendant's act was a substantial factor causing the death, then the defendant is legally responsible for the death.  This is true even if Travis Smith would have died in a short time as a result of other causes or if another person of average health would not have died as a result of the defendant's actions.

"If you have a reasonable doubt whether a defendant's act caused the death, you must find him not guilty."

*Id*.

The Court finds no basis for disagreeing with the California Court of Appeal's conclusion that the trial court did not fail to *sua sponte* give the jury an instruction on superceding cause.  Gray cannot establish that the omission of an instruction on superceding cause rendered his trial fundamentally unfair in light of the causation instructions as a whole because, as the appellate court noted, the jury was instructed on the causation principles relevant to this case.

Moreover, in either his Petition or his brief on direct appeal, Taylor cites no federal law compelling the provision of a superceding cause instruction under these circumstances and

13

indeed cites only state law in support of his claim. However, "the fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle*, 502 U.S. at 71-72 (citing *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the state evidentiary rules.")); *Horton v. Mayle*, 408 F.3d 570, 576 (9th Cir. 2005) ("If a state law issue must be decided in order to decide a federal habeas claim, the state's construction of its own law is binding on the federal court."). Claims of error in state jury instructions are generally a matter of state law that do not usually invoke a constitutional question. *Gilmore v. Taylor*, 508 U.S. 333, 342-43 (1993). This Court is bound by the state appellate court's determination that the trial court was not required under California law to *sua sponte* give a superceding cause instruction in the absence of any due process violation. Gray fails to establish a due process violation here because he may not transform his state instructional error claim into a federal claim by simply asserting a violation of his constitutional rights. *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996) (a petitioner cannot transform a state-law issue into a federal one by simply asserting a due process violation); *see also Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988) (an instructional error "does not alone raise a ground cognizable in a federal habeas corpus proceeding") (citation omitted).

Nor is the Court of Appeal's conclusion that the trial court was not required to *sua sponte* give a different superceding causation instruction contrary to federal law. Federal law, like California law, requires that if a defendant "actually presents and relies upon a theory of defense at trial," the trial court "must instruct the jury on that theory," even in the absence of a request by the defendant, if there is a foundation for the defense in the evidence and the law. *United States*

14

*v. Bear*, 439 F.3d 565, 568 (9th Cir. 2006).  But federal law, much the same as California law, mandates that a judge is not required to *sua sponte* give a specific instruction where, as here, the instructions as a whole adequately ensure that the jury is fully instructed on an issue.  *See United States v. Shubaralyan*, 428 F. App'x 685, 686-87 (9th Cir. 2011).[5]

Furthermore, the Court of Appeal alternatively denied Gray's claim on the additional ground that "any error in instructing the jury on causation was harmless beyond a reasonable doubt because no reasonable jury could conclude that [Gray's] acts were not a concurrent cause of Smith's death."  *Id.* at *11.  It concluded:

> Smith's actions would relieve [Gray] of criminal liability only if the jury found that [Gray's] actions of punching Smith, stomping on his head, leaving him outside overnight, and instructing others not to call for help were not a concurrent cause of Smith's death. . . .  Dr. Comfort and Dr. Hermann both testified that Smith died as a result of blunt force trauma to the head, and that Smith's consumption of alcohol and Fentanyl was a contributing factor.  On this record, no reasonable jury could have found that [Taylor's] assault was not a concurrent cause of Smith's death.

*Id*.

A claim of jury instruction error is likewise reviewed under a harmless error standard on federal habeas review.  *Evanchyk v. Stewart*, 340 F.3d 933, 940-41 (9th Cir. 2003).  Habeas relief is only available where the error had a "substantial and injurious effect or influence in determining the jury's verdict" and resulted in "actual prejudice."  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Hedgpeth v. Pulido*, 555 U.S. 57, 61-62 (2008).  The relevant question is "whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation."  *United States v. Elofus*, 598 F.3d 1171, 1174 (9th Cir. 2010).  A federal court

---

[5]        Cited for persuasive value pursuant to Ninth Circuit Rule 36-3.

sitting in habeas review must independently "apply the *Brecht* test without regard for the state court's harmlessness determination." *Pulido v. Chromes*, 629 F.3d 1007, 1012 (9th Cir. 2010).

Gray faults the Court of Appeal's harmlessness determination as engaging in impermissible fact finding that deprived him of his right to a jury finding on an element of his offense—causation.  He argues:

> The state court of appeal here concluded that no jury could "reasonably conclude" that Smith died as a result of a fall or other subsequent injury, despite the testimony of the hospital doctors that this is exactly what happened.  Thus, the state court concluded that the jury "would surely have found" petitioner guilty beyond a reasonable doubt. "That is not enough"; the court of appeal usurped the jury's function.
>
> The court of appeal found that the lack of an instruction on a subsequent injury as a superseding intervening cause was inconsequential, because no reasonable jury would believe the hospital doctors.  This is beyond the constitutional authority of the state judges; it is up to the jury to determine the credibility of the competing expert witnesses, and whether a subsequent injury was a superseding intervening cause.  The court of appeal, by usurping the jury's function, violated petitioner's right to Due Process and his right to jury trial.

This argument appears to be premised on Justice Scalia's concurring opinion in *Carella v. California*, 491 U.S. 263, 267-68 (1989) (Scalia, J., concurring).  In *Carella*, Scalia opined that, where jury instructions omit an element of the offense due to mandatory presumption, traditional harmless error analysis is inappropriate because it substitutes the appellate court's findings of facts for the jury's and is akin to an impermissible directed verdict.  *Id.*  He thus suggested a modified harmless error review that would focus on what the jury did find to determine whether its findings were "functionally equivalent to finding the element to be presumed."  *Id.* at 271.  But as previously discussed, the proffered instructions did not omit the element of causation, and thus this argument has no applicability here.  The jury's conviction necessarily dictates findings against the testimony of the defense's expert witnesses and that the subsequent fall was not sufficient, on its own, to cause Smith's death.

16

Moreover, accepting Gray's argument that an appellate court can never review the trial evidence to determine what a reasonable jury could conclude would render harmless error review meaningless in nearly any case challenging the sufficiency of jury instructions, which is not supported by federal law, much less any authority of the United States Supreme Court.  And to the extent that Gray's argument can be construed to argue that, consistent with Justice Scalia's concurrence in *California v. Roy*, 519 U.S. 2, 7-8 (1996) (per curiam) (Scalia, J., concurring) (*Roy II*), an appellate court is precluded from independently examining the evidence and is instead limited to a review of the facts necessarily found by the jury, such argument also must fail.  The Ninth Circuit explicitly rejected Justice Scalia's approach in *Roy v. Gomez*, 108 F.3d 242, 242 (9th Cir. 1997) (*Roy III*), when it concluded that "when evaluating the harmlessness under *Brecht* of errors of misdescription or omission in jury instructions, we are free to engage in our own review [of] the record," *Pollard v. White*, 119 F.3d 1430, 1434 (9th Cir. 1997).

Consistent with that independent review, the Court likewise concludes that any instructional error was harmless.  Gray has not established any likelihood that he was prejudiced by the instructions or that the jury would have reached a different verdict had it received the charge Gray now believes to be appropriate.  *Brecht*, 507 U.S. at 637.  The Court thus finds no basis to conclude that Gray's conviction was the result of an "extreme malfunction" of the state criminal justice system."  *Richter*, 562 U.S. at 102.  Gray is therefore not entitled to relief.

And to the extent Gray's instructional error claim may be construed to additionally raise a claim that the evidence was insufficient to demonstrate that Gray's actions proximately caused Smith's death, such insufficiency of the evidence claim also must fail.  As articulated by the

Supreme Court in *Jackson*, the federal constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard).  This Court must therefore determine whether the California court unreasonably applied *Jackson*.  In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial.  *Jackson*, 443 U.S. at 318-19.  Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution."  *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law.  *See Engle v. Isaac*, 456 U.S. 107, 128 (1982).  Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law.  *Jackson*, 443 U.S. at 324 n.16.  A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law.  When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").  "Federal courts hold no supervisory

authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted).

Gray reiterates that the defense expert witnesses opined that it was more likely that Smith's skull fractures were the result of a new fall as opposed to being missed on the earlier CAT scans. But Gray's argument is nothing more than an attack on the testimony of the prosecution's expert witnesses, who offered inapposite opinions. This Court is precluded from either re-weighing the evidence or assessing the credibility of witnesses. *Schlup v. Delo*, 513 U.S 298, 330 (1995); *Bruce v. Terhune*, 376 F.3d 950, 957-58 (9th Cir. 2004). Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction. *Schlup*, 513 U.S. at 330. The United States Supreme Court has recently even further limited a federal court's scope of review under *Jackson*, holding that "[a] reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (per curiam). *Jackson* "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Id.* at 3-4. Under *Cavazos*, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id.* at 4 (*quoting Renico v. Lett*, 559 U.S. 766, 773 (2010)).

Although it might have been possible to draw a different inference from the evidence, this Court is required to resolve that conflict in favor of the prosecution. *See Jackson*, 443 U.S.

at 326.  Importantly, all of the evidence Gray relies upon in arguing that Smith's later fall was the sole cause of his death was presented to the jury, who considered and rejected it.  Viewing the totality of the evidence in the light most favorable to the verdict, this Court concludes that there was sufficient evidence introduced at Gray's trial from which a rational trier of fact could have found beyond a reasonable doubt that the injuries he sustained during the beating "caused" the death of Smith, as that term is defined by California law and discussed above.  The record does not compel the conclusion that no rational trier of fact could have found proof that the actions of Gray and his co-defendant caused Smith's death, especially considering the deference owed under *Jackson*, *Cavazos*, and the AEDPA.  Accordingly, Gray is not entitled to habeas relief on any claim that the evidence introduced at trial was insufficient to support the jury's finding that the injuries inflicted upon Smith during the beating were the cause of his death.

## V. CONCLUSION AND ORDER

Gray is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: August 26, 2015.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge

21